RABB v. SEIDEL et al.    (No. 374–3480.)*

(Commission of Appeals of Texas, Section B.
April 25, 1923.)

I. Bills and notes ⬅63—Possession of note by payees for indorsement in blank without acceptance and without giving value held not a constructive delivery.

Where defendant signed as surety a note reciting that it was secured by mortgage and made payable to two persons named who were to advance the money thereon, but who, after the note was made out, refused to do so, but were induced to indorse the note in blank without recourse, having physical possession of it for such purpose, there was no constructive delivery of the note to the payees, the note not having been accepted nor any value received from the payees therefor.

2. Principal and surety ⬅95—Surety on note never delivered to payee, but put up as collateral for another debt, held not liable.

Where defendant signed as surety a note payable to two persons named, and reciting that it was secured by mortgage, but no money was advanced and no mortgage made out, and the note never delivered to the payees except for purposes of indorsement without recourse, the note subsequently being put up as collateral for the payment of another note in favor of plaintiff's assignor, held, that the surety was not liable.

3. Bills and notes ⬅342—Bank taking note as collateral held chargeable with knowledge from its face that it had not been completed as a contract.

Where defendant signed as surety on a note reciting that it was secured by mortgage,

and the note was never delivered to the payees named therein, and no mortgage was ever executed a bank accepting the note as collateral for a loan to the makers held chargeable with knowledge by the face of the note that the payees had never accepted and paid value for the note, and that it had never been completed as a contract.

Error to Court of Civil Appeals of Fourth Supreme Judicial District.

Action by William Seidel against Frank Rabb and others.    Judgment for plaintiff was affirmed by the Court of Civil Appeals (218 S. W. 607), and defendant named brings error.    Judgments of the trial court and Court of Civil Appeals reversed and rendered.

E. P. Scott, of Corpus Christi, and H. D. McDonald, of Paris, for plaintiff in error.

G. E. Pope, of Goliad, and G. R. Scott, Boone & Pope, of Corpus Christi, for defendants in error.

HAMILTON, J.    William Seidel brought this suit on a promissory note reading:

"$10,000.00.

"Corpus Christi, Tex., Sept. 30, 1907.

"One year after date I, we or either of us for value received promise to pay to the order of B. H. Wilson and A. C. Priday the sum of ten thousand dollars, with interest thereon from date hereof, at the rate of ten per centum per annum from date until paid.    Interest payable annually, as it accrues, and both principal and interest payable at Corpus Christi, Texas.

"And in case default is made in the payment of this note we promise and bind ourselves, severally, to pay ten per cent. additional on the amount of principal and interest due as attorney's fees, in the event this note is placed in the hands of an attorney for collection after maturity.

"This note is secured by a deed of trust this day executed by D. M. N. Turner and S. M. Turner, on real estate situated in the counties of Nueces and Bexar, therein described ten thousand dollars; and also by deed of trust this day executed by T. J. Lawson and Jess S. Fry in favor of the holder or holders of this note, on and upon their entire interest in the Piedras Pintas oil field, including oil leases, oil now produced and to be produced, tanks, pipe line, loading racks, boilers, engines, wells and machinery of every kind and description.

"Jess S. Fry.
"T. J. Lawson.
"D. McN. Turner.
"S. M. Turner.
"Frank Rabb."

The cause was tried by the court without a jury, and, at request of defendants, the court filed findings of fact and conclusions of law as follows:

"Findings of Fact.

"First. On and prior to September 30, 1907, defendants T. J. Lawson, Jesse S. Fry, and D. McNeill Turner were interested in the development of the Piedras Pintas oil field in

Duval county, Tex., and engaged in the production and marketing of oil which was being produced in said field. They were in need of money to enable them to carry on their development and production and concluded to obtain a loan for such purpose. Through D. McNeill Turner they conducted negotiations with B. H. Wilson and A. C. Priday for a loan of $10,000 for such purposes, and, to obtain it, it was proposed by said Turner, that Lawson, Fry himself, Mrs. S. M. Turner, and Frank Rabb should execute and deliver a note to said Wilson and Priday for said sum, and that the same should be additionally secured by a deed of trust to be executed by Lawson and Fry on all of their interest in said oil field, the oil already produced as well as future production, and Mrs. S. M. Turner, wife of D. McNeill Turner, was also to give a deed of trust on certain properties belonging to her in Bexar and Nueces counties.

"Second. Wilson and Priday having agreed to make the loan, a joint and several note for $10,000 was drawn, dated September 30, 1907, payable to the order of B. H. Wilson and A. C. Priday one year after date, with interest at the rate of 10 per cent. per annum from date until paid, payable annually, both principal and interest payable at Corpus Christi, Tex., and providing that, in case default was made in the payment of said note, the makers should pay an additional amount of 10 per cent. on the principal and interest of said note as attorney's fee in the event same was placed in the hands of an attorney for collection after maturity, and reciting that it was secured by a deed of trust executed by D. McNeill Turner and S. M. Turner on real estate situated in Bexar and Nueces counties and by a deed of trust executed by T. J. Lawson and Jesse S. Fry upon their entire interest in the Piedras Pintas oil field, including oil leases, oil then produced and to be produced, tanks, pipe lines, loading racks, boilers, engines, wells, and machinery of every kind and character. This note was executed at Corpus Christi, Tex., on the day of its date by said T. J. Lawson, Jesse S. Fry, D. McNeill Turner, S. M. Turner, and Frank Rabb, and is a joint and several note and on its face appears to have been made by the several makers as principals. After being so executed, this note was left with D. McNeill Turner and T. J. Lawson to be negotiated for the purpose of obtaining money to enable said Fry, Lawson, and Turner to prosecute said oil business, and after its execution Frank Rabb left the city and returned to his home in Brownsville.

"Third. After said note was so executed and left with said Lawson and McNeill Turner for negotiation, as aforesaid, said Wilson and Priday declined to make said loan, and, being still desirous of obtaining said money thereon, and for the purpose of enabling him to use said note, said McNeill Turner got Wilson and Priday to indorse said note in blank, which they did by indorsing the same in blank as follows: 'Pay to the order of ——— without recourse on us. B. H. Wilson. A. C. Priday.'

"Fourth. The note as so executed by the parties aforesaid was never delivered to the payees, Wilson and Priday, in the sense that they advanced any money thereon, but the same was indorsed by them in blank, as aforesaid, at the request of said D. McNeill Turner,

to enable the said Turner, Lawson, and Fry to use the same for the purpose of obtaining the desired loan, and was left with said Turner.

"Fifth. For such purpose, after said note was so indorsed, Fry, Lawson, and Turner took said note to San Antonio, Tex., for the purpose of endeavoring to negotiate the same for such purpose and they there endeavored to negotiate it, but failed to obtain money thereon, and, at the suggestion of Lawson, Turner, and Lawson went to Goliad for the purpose of trying to negotiate said note to the First National Bank of Goliad. At the latter place Lawson and Turner began negotiations with said bank through W. B. Campbell, president thereof, to obtain money on said note for the purposes for which it was executed. In their negotiations Turner and Lawson represented to Mr. Campbell, as president of said bank, that they desired the money on said note for the purpose of developing said oil field and producing and marketing oil therefrom, and as an inducement to him to loan said money represented that Frank Rabb was worth from $100,000 to $400,000.

"Sixth. At the time of the negotiations with Mr. Campbell, president of the First National Bank of Goliad, he did not know Frank Rabb, and did not know his financial standing, but he relied upon the information furnished him by said Turner and Lawson, and on the strength of Frank Rabb's name on said note, the First National Bank of Goliad agreed to loan Lawson and Fry $6,000, to be immediately available, and the $10,000 note was to be put up as collateral security, and the deeds of trust called for in said note were to be delivered to said bank.

"Seventh. Accordingly, on the 4th day of October, 1907, for the purpose of carrying said negotiations into effect and to obtain said sum of $6,000, said Lawson and Fry made, executed, and delivered to said the First National Bank of Goliad their joint and several promissory note, bearing said date, payable to said bank 90 days after date, in said sum of $6,000, with interest from maturity until paid at the rate of 10 per cent. per annum, interest payable annually, and, if not paid when due, to bear the same rate of interest as the principal, and providing that failure to pay any installment of interest should, at the option of the holder, mature the whole note, and that, if said note was not paid at maturity, and was collected by an attorney or through legal proceedings, an additional amount of 10 per cent. as attorney's fees should be paid, and reciting that said $10,000 note was transferred and delivered as collateral security to said bank, and that a note for $6,000 signed by D. McNeill Turner and S. M. Turner, was also delivered as collateral, and authorized the holder of said note to sell said collateral on default of said note at public or private sale, with or without notice, and said note, so executed was on said date delivered to said the First National Bank of Goliad by Lawson and Fry as collateral security thereto, said note for $10,000 sued on herein and above described as so indorsed was delivered to said bank, the said bank inserted in said blank indorsement its name, as the transferee thereof, and the indorsement thereon now appears as follows: 'Pay to the order of First National Bank of Goliad without recourse on us. B. H. Wilson.

A. C. Priday.' And as a part of the said transaction, and as additional security to the payment of said note for $6,000, the note of Mrs. S. M. Turner and D. McNeill Turner and the deed of trust which they agreed to give were executed and delivered to said bank, and also as additional security the 'deed of trust above referred to was executed by Lawson and Fry and delivered to said bank. And said bank thereupon advanced said sum of $6,000 to said Lawson and Fry, and said money so advanced was used by said parties for the purpose for which said loan was obtained.

"Eighth. Default was made by Lawson and Fry in the payment of said $6,000 note at its maturity, and sometime thereafter the First National Bank of Goliad, being still the owner and holder of said note, brought suit thereon against Lawson and Fry and the trustees in the deeds of trust to enforce the collection of said note and foreclosure of the lien of the deed of trust, and on the 11th day of September, A. D. 1916, obtained judgment in the district court of Goliad county, Tex., for the amount of the balance due on said note, principal, interest, and attorney's fees, and all costs of court.

"Ninth. Default having been made by Mrs. S. M. Turner and D. McNeill Turner in the performance of the conditions of the deed of trust executed by Mrs. S. M. Turner joined by said D. McNeill Turner said deed of trust was enforced on the properties therein conveyed and the proceeds realized therefrom were applied on said indebtedness; part of said proceeds being applied before the judgment so rendered against T. J. Lawson and Jesse S. Fry and part subsequent to the rendition of such judgment.

"Tenth. Prior to the trial of this cause in this court, the First National Bank of Goliad had exhausted all the securities afforded by the aforesaid deeds of trust, and there was outstanding and unpaid on the indebtedness due it the amount of the balance due on said judgment, principal, interest, and attorney's fees and costs of court, as hereinafter stated, and the only security remaining to said bank for the payment of said indebtedness was the note sued on and in controversy in this cause.

"Eleventh. Subsequent to the delivery of the note in controversy in this cause to the First National Bank of Goliad, same was transferred, assigned, and delivered by said bank to plaintiff herein as trustee for said bank, and the same has since been held and is now held by said plaintiff as such trustee for the use and benefit of said bank.

"Twelfth. At the time defendant Frank Rabb signed the note in controversy herein he had no interest in said oil field, and went on said note as an accommodation to Mr. and Mrs. D. McNeill Turner, to enable Lawson and Fry to obtain money for the development of said oil industry, and the said Frank Rabb was, in fact, a surety on said note.

"Thirteenth. Other than the notice imputed by the indorsement on said note, as hereinbefore found, the First National Bank of Goliad had no other notice of the status of Frank Rabb on said note.

"Fourteenth. The First National Bank of Goliad made said loan to Lawson and Fry and advanced said credit on the strength of the security afforded by said $10,000 note and the signature of the said Frank Rabb thereto.

"Fifteenth. The money obtained by Lawson and Fry from said bank on said note was used by them in their operations in said oil field for the purpose for which said loan was made and obtained by them.

"Sixteenth. At the time of the execution of said note Mrs. Sunetta M. Turner, who signed the same as one of the makers, was the wife of defendant D. McNeill Turner.

"Seventeenth. On the 20th day of February, 1919, the date of the judgment herein, after applying all credits, there was due the First National Bank of Goliad, Tex., on the judgment obtained by said bank in its suit against said T. J. Lawson and Jesse S. Fry in cause No. 2236, the First National Bank of Goliad, Tex., v. T. J. Lawson and Jesse S. Fry, the sum of $5,373.80, with interest thereon from said 20th day of February A. D. 1919, until paid at the rate of 10 per cent. per annum.

"Eighteenth. Ten per cent. on the amount of the balance due on said judgment is the reasonable amount of the attorney's fees due plaintiff in this cause.

## "Conclusions of Law.

"From the foregoing facts I find the following:

"First. The $10,000 note sued on having been executed by the makers for the purpose of obtaining money thereon, and same having been indorsed without recourse by Wilson and Priday and returned to D. McNeill Turner, one of the makers, for the purpose of being used by him to obtain money in furtherance of the original purposes of the makers of said note, including the defendant Frank Rabb, same was constructively delivered to the payees, Wilson and Priday, and the subsequent negotiations of said note to the First National Bank of Goliad, as found in the preceding findings of fact, constituted delivery of said note to said First National Bank of Goliad, and T. J. Lawson, Jesse S. Fry, and D. McNeill Turner, as principals, and Frank Rabb, as surety, became and were liable to the First National Bank of Goliad, the holder thereof, for the payment of said note, principal interest, and attorney's fees, according to the terms thereof.

"Second. Since said note is held by the plaintiff herein in trust for the use and benefit of the First National Bank of Goliad and as collateral security to the payment of the note of Lawson and Fry for $6,000, which was merged in the judgment in said cause numbered 2236, First National Bank of Goliad v. T. J. Lawson and Jesse S. Fry, referred to in the findings of fact hereof, and plaintiff is entitled to recover against the defendants herein only the amount of the balance due on said judgment, with interest thereon and costs and 10 per cent. additional thereon as reasonable attorney's fees and all costs in this behalf incurred.

"Third. Mrs. S. M. Turner labored under the disability of coverture at the time she executed the note sued on herein, and plaintiff is not entitled to judgment herein against her.

"Fourth. The payment and satisfaction of the judgment in this cause should operate to satisfy and discharge the judgment of the dis-

trict court of Goliad county, Tex., hereinbefore referred to.

"Fifth. I accordingly conclude that plaintiff William Seidel, as trustee for the use and benefit of the First National Bank of Goliad, Tex., is entitled to judgment against defendants T. J. Lawson, Jesse S. Fry, and D. McNeill Turner, as principals, and Frank Rabb, as surety, in the sum of $5,911.18, being the amount of the principal, interest, and attorney's fees to which said bank is entitled on the note sued on herein, with interest from the 20th day of February, A. D. 1919, until paid at the rate of 10 per cent. per annum, and all costs in this behalf incurred, which judgment shall be in full settlement, satisfaction, and discharge of the balance due on the judgment in the district court of Goliad county, Tex., above referred to. and that plaintiff should take nothing by this suit against defendant Mrs. Sunetta M. Turner, and that she go hence without day with her costs."

The Court of Civil Appeals states that no request was made for additional findings of fact, and none additional were found by that court except that "there was nothing said to or by Rabb concerning negotiation of the note to others than Wilson and Priday in the event they should fail or refuse to complete the loan," and that "it was contemplated that Wilson and Priday would accept the note and advance the money, and the contingency of refusal on their part was not discussed." The judgment of the trial court was affirmed by the Court of Civil Appeals. 218 S. W. 607.

Whether or not an accommodation note never accepted by the payee is binding on the accommodation surety when disposed of by another of the makers to a third person without the knowledge or consent of the accommodation surety is a question on which the Courts of Civil Appeals in Texas are not in harmony, and on which the holdings of the courts of last resort in other states are in conflict. It has not been decided by our Supreme Court. In the case of Eck v. Schuermeyer, 29 S. W. 241, it was held by the Third Court of Civil Appeals that the delivery of the note by the maker to another than the payee, without knowledge or consent of the surety, released the surety. The decision is placed upon the ground that a promissory note, in order to create a valid and binding obligation against the makers, must be delivered to the payee named in the note because the payee so named is one of the parties to the contract, and that, when there is no delivery to the named payee, there is lacking one of the elements of the contract essential to make it valid and binding upon the surety who has not agreed to its delivery to another. In that case the note was payable to order. In the case of Battle v. Cushman, 33 S. W. 1037, the Court of Civil Appeals for the Second District held that, where the principal maker of a note, payable to a person named or bearer, delivers it to an-

other than the payee, it is void as to the surety, and that the person to whom it was delivered was charged with notice of that fact. That decision follows Eck v. Schuermeyer, supra, and further holds that the note taken from the hands of the maker by the third person did not come into such person's hands in "due course of business." In the case of Bull v. Latimer & Helm, 80 S. W. 252, the Fourth Court of Civil Appeals held that, where a note is made payable to A. for the purpose of being discounted by him, and on his refusal it is discounted by B., the latter may sue both the principal and surety, and recover on the note, just as A. could have done had he discounted it.

There are numerous authorities supporting the holdings of the two cases first mentioned, and equally as many supporting the holding of the last-mentioned case. Some of those supporting the Eck and the Battle decisions, and upon which we base the disposition of the question, are: Centralia First Nat. Bank. v. Strang, 72 Ill. 559; Chase v. Hathorn, 61 Me. 505; Granite Bank v. Ellis, 43 Me. 367; Prescott v. Brinsley, 6 Cush. (Mass.) 233; Adams Bank v. Jones, 16 Pick. (33 Mass.) 574; Parker v. McDowell, 95 N. C. 219, 59 Am. Rep. 235; Southerland v. Whitaker, 50 N. C. 5; Dewey v. Cochran, 49 N. C. 189; Greenville v. Ormand, 51 S. C. 58, 28 S. E. 50, 39 L. R. A. 847, 64 Am. St. Rep. 663; Janes v. Benson, 155 Pa. 489, 26 Atl. 752, 35 Am. St. Rep. 899; Clinton v. Ayres, 16 Ohio, 282; Knox County Bank v. Lloyd, 18 Ohio St. 353; Stone v. Vance, 6 Ohio, 246; Moulton v. Posten, 52 Wis. 169, 8 N. W. 621; Roberts v. McGrath, 38 Wis. 52; Burson v. Huntington, 21 Mich. 416, 4 Am. Rep. 497.

In the case now under consideration there was no delivery of any kind to the payees. The trial court found, as a fact, that the note "was never delivered to the payees, Wilson and Priday, in the sense that they advanced any money thereon but the same was indorsed by them in blank." As a conclusion of law that court found that the note "was constructively delivered to the payees, Wilson and Priday." The Court of Civil Appeals found that "the note was undoubtedly passed into the actual possession of the payees, but only for the purpose of having it indorsed by them to aid in the further negotiation of the note to some other person." The undisputed evidence of D. McNeill Turner concerning the circumstances surrounding the only occasion on which Wilson and Priday, or either of them, are shown to have seen the note is as follows:

"* * * Fry and Lawson being unable to secure other securities or to furnish other personal indorsements, I, for the purpose of securing a contingent interest in the output of the oil field, which depended on the successful negotiation of the proposed loan, offered to put up my wife's property in Nueces and Bexar counties as additional security. While this

proposition was being considered by Wilson and Priday, Mr. Frank Rabb, another client of mine and a great friend of Mrs. Turner and myself, happened to drop into the office. Mrs. Turner, being anxious for me to get a foothold in the oil field, explained the situation to Mr. Rabb. Mr. Rabb then agreed to sign the note to Wilson and Priday, as surety. Mr. Wilson and Priday returning about this time, I told them that Mr. Rabb had agreed to sign the note as additional security. They then said, 'Go ahead and make out the necessary papers, and we will let you have the money.' I then drew up the note involved in this suit and at the same time a deed of trust from Lawson and Fry to all of their interest in the oil field and the oil already produced, as well as future productions, and a deed of trust from my wife to her property in Bexar and Nueces counties, to secure the same, the note having been executed by Fry and Lawson as principals and Mrs. Turner, Frank Rabb and myself as sureties, but before the trust deed had been completed, Mr. Wilson came to the office and said that Priday had backed out and the deal was off. At this time Mr. Rabb had left the city for his home in Brownsville, Tex. As I could not see and get him to agree to act as surety in the event we could secure the desired loan from other parties, and as San Antonio seemed to be our only hope, and as he had so willingly signed the note in question, I then determined to get Wilson and Priday to indorse the note in blank to use it in place of a new one executed by Rabb in negotiating a loan. Fry had in the meantime phoned to San Antonio and talked with his mother who agreed to make the loan on the security offered. I then saw Wilson and Priday and requested them to come to the office and indorse the note as payees, in blank, explaining to them that Rabb had gone and that it would delay matters to get a new note, and that I proposed to use the note in question. They both declined to make the indorsement until they had taken the advice of a disinterested lawyer. After some time, they returned and agreed to indorse the note in blank 'without recourse on them.' I then got the note out of my desk and placed it in my typewriter and wrote on, as near as I can remember, these words, 'Pay to the order of ——— without recourse on us.' I may have written 'or either of us' also, but I don't remember. I then placed the note upside down on my desk, and both Priday and Wilson signed their names under the indorsement as made by me. I returned the note to my desk."

[1] We think the conclusion of law that there was a constructive delivery of the note to payees is erroneous. There could be no delivery without acceptance. Physical possession of the note, if payees actually had such possession, is not delivery in the legal sense. There could have been no legal delivery without compliance on the part of payees with the contract. Rabb and the other makers contracted to pay the sum of money named on the terms specified in the note to the payees for value received. The payees refused to accept the note and failed to make the loan agreed on at the time Rabb signed the note. There was no value re-

ceived and no delivery in the sense in which that term is used as an essential element in a contract created by note. Wilson and Priday broke the agreement which induced Rabb to sign the note—the agreement to loan the $10,000.

[2] Without Rabb's knowledge the note was pledged as collateral for the payment of a $6,000 note in favor of the First National Bank of Goliad. Rabb did not agree that the note should be pledged as collateral, but his agreement and expectation, as found by the Court of Civil Appeals, was that Wilson and Priday would accept the note and advance the money. He did not contract that the principals in the note should receive less than the $10,000 discounted at legal rate. We can conceive that one might be willing to sign a note as surety for $10,000 and unwilling to sign as such surety for a less sum. If in his judgment $10,000 would enable his principal to develop his enterprise and place it on an earning basis so that he, in the judgment of the surety, could discharge the note with those earnings, he might readily sign a note as surety for that amount, when, if in his judgment $6,000 would be insufficient to place such enterprise on a paying basis, he might decline to sign a $6,000 note as such surety. Again, as said in the case of Clinton Bank v. Ayres, 16 Ohio, 282, in the language of 8 C. J. p. 281, note 62:

"The makers (sureties) might be willing to loan their credit and become indebted to some particular creditor, but not to another. They might be willing to lend their names to procure a loan from a party who would advance to their principal the full face of the note, when they would be entirely unwilling to go security to one who was their personal enemy, or who would exact harsh terms or heavy interest of their principal. They might have been willing to aid him in procuring a loan of ready cash, when they would have been unwilling to become his surety for an old debt."

It is said in Evans v. Speer Hdw. Co., 65 Ark. 204, 45 S. W. 370, 67 Am. St. Rep. 919, in criticism of the reasoning of the court in the Clinton Bank Case just quoted:

"This reasoning is not satisfactory to us, for when one makes his paper negotiable he contracts with reference to the law applicable to such paper. Even had the bank in the case at bar discounted the note, the next instant, by an indorsement such as we have here, it might have passed it into the hands of the very persons with whom, according to the reasoning of the Ohio case, the makers were unwilling to contract."

While it is true that by indorsement "it might" pass into hands of such person, yet we think the surety has a right to contract with reference to his judgment as to whether the payee will indorse and dispose of his note. There are many who make a business of buying notes for the interest they yield, and who do not usually sell them. While such a

person might sell the note the probabilities are that he would not, and in such a case the surety should have the benefit of that probability. Then, again, the surety might be influenced to sign, as such, by reason of his confidence in the business judgment of the payee in the enterprise for which the money is sought. The ability of the principal to pay the note and thus to save the surety is dependent in many instances on the success of the undertaking for which the money is loaned. The lender is often not unconcerned as to the success or failure of the undertaking when he makes the loan though there may be sureties on the note. In such case if his business judgment approves the venture he makes the loan; otherwise he refuses it notwithstanding there are sureties. Wilson and Priday refused the loan in this case, although there were sureties on the note. Though the payee in such case may sell the note afterward the surety has, in the first instance, the benefit of the payee's judgment as to the success of the undertaking. If the payee intends to sell the note immediately, still he is not oblivious to the success of the enterprise, for the reason that the purchaser from him of such note would be equally interested in the success of the business in which the principal is engaged. The success or failure of the borrower is not unrelated to the value of his paper though secured, and a surety might readily sign a note if a named payee was willing to advance money on it when he would as readily refuse to sign it if such payee were unwilling to advance money on it. '

[3] Furthermore, the note states on its face that it is secured by deeds of trust on realty. These were never executed. Rabb never promised to pay this note unsecured by liens on the property provided for therein at the time he signed it. Wilson and Priday indorsed the note unsecured by any liens, and it was pledged as collateral with no liens executed. Until the liens referred to on the face of the note were executed, the note was invalid as against Rabb. Wilson and Priday knew no liens had been executed to secure the note when they indorsed it in blank. The First National Bank was put on inquiry as to the completion of the contract by the stipulations of the note as to liens. That bank was charged with knowledge by the face of the note that Wilson and Priday had never accepted and paid value for it. The bank therefore was not only put on inquiry as to whether the note had ever taken its inception as a contract, but it was charged, by the face of the note and its indorsement, with knowledge that the agreement had never been completed, and therefore that the note had not taken its inception as a contract. The fact that the $6,000 note, to secure which the $10,000 note was pledged as collateral, was secured by liens on the property is immaterial. The $10,000 note was not a valid obligation when it was presented to the Goliad bank, and it could not be made valid by any act independent of Rabb. It received no vitality from the $6,000 note or from the liens securing that note.

We recommend that the judgment of the trial court and of the Court of Civil Appeals be reversed, and that judgment be rendered for plaintiff in error.

CURETON, C. J. Judgments of the trial court and Court of Civil Appeals both reversed, and judgment rendered in favor of the plaintiff in error, Rabb.